LUTES *v.* THE STATE OF OHIO.

(Decided January 13, 1930.)

*Mr. Robert S. Marx* and *Mr. Nicholas J. Hoban,* for plaintiff in error.

*Mr. Nelson Schwab,* prosecuting attorney, and *Mr. Dudley M. Outcalt,* for defendant in error.

RICHARDS, J. Breck Lutes was indicted, tried, and convicted for first-degree murder in the killing of Peter Dumele on April 8, 1928, the conviction carrying with it, however, a recommendation of mercy. Three others, namely, Rodney Ford, John Todd Messner, and Robert Zwick, were jointly indicted with the defendant. The indictment contained three counts, the first count charging that the defendant and the others indicted with him purposely killed Peter Dumele while engaged in perpetrating a robbery of said Peter Dumele and others. The second count charged that Peter Dumele was killed purposely and with deliberate and premeditated malice, and the third count that the defendant and the others jointly indicted with him purposely and wilfully killed Peter Dumele, then and there being the marshal of the village of North College Hill in Hamilton county, while he was discharging his duties as such marshal, knowing him to be such marshal. On the trial of Rodney Ford, he was convicted of murder in the first degree; and, on the trial of John Todd Messner, he was convicted of murder in the first degree with a recommendation of mercy. Robert Zwick has not yet been apprehended.

. The crime was committed in a pool room in the village of North College Hill in Hamilton county about 1:10 o'clock in the morning of April 8, 1928, that day being Easter Sunday. The record is very voluminous, the bill of exceptions containing more

than 2,100 pages, besides a great many exhibits. We have given this record the careful examination which the importance of the case requires.

Application was made to the trial court for a change of venue, which the court, on consideration, overruled. The evidence shows that there was much excitement in Cincinnati growing out of the crime and the trials of Ford and Messner, and much newspaper comment on the situation. It does not, however, show a state of feeling different from that which not infrequently arises in such cases, and does not show that the defendant could not receive a fair trial in Hamilton county before an impartial jury. The motion for a change of venue was not in fact overruled until just before the jury was sworn, and when it had become apparent that an impartial jury could be obtained. The trial judge committed no error in overruling the motion for a change of venue.

The defendant Lutes challenged the array both of the grand jury and the petit jury, and this challenge, on due consideration, was overruled by the court. The challenge was based upon the contention that the names of electors to serve as jurors were not selected by the jury commissioners in accordance with the statute. The evidence shows that the jury commissioners were men of wide acquaintance throughout Hamilton county. They used various methods of selecting names of qualified electors to be placed in the jury wheel, using first, of course, their own wide acquaintance, and supplementing that with lists obtained from telephone books, women's clubs, and numerous other sources. They did not know or have in mind, when beginning the selection, the number of names to which each ward and town-

ship in the county was entitled, but after getting their lists together and making a comparison discovered that they had too many names for some wards and townships and not enough for others, and therefore weeded out from some and added to others until they had the requisite number for the several political divisions of the county. They had some 2,000 names to select and appear to have exercised at least reasonable care and judgment in the selection of the names, and to have investigated the qualifications of those selected, and to have complied substantially with the requirements of the statute. It is urged that the names were ''hand-picked,'' but the list of electors ultimately chosen appears to be a fair cross-section of the qualified electors of the county, and we find no prejudicial error in overruling the challenge to the array.

Furthermore, it appears that on impaneling the petit jury the defendant only exercised 14 peremptory challenges out of the 16 to which he was entitled. Before the jury was sworn the court inquired of the state whether it was satisfied with the jury, and it answered that it was, and thereupon the court made the same inquiry of counsel for the defense, and without further objection counsel for the defense announced ''the jury may be sworn.'' A thirteenth juror was thereupon selected, and before this juror was sworn the court inquired of both the state and the defense whether they were satisfied with the jury. The state thereupon expressed its satisfaction, and counsel for the defendant then answered, ''We are satisfied.'' After all this had occurred, we think the defendant had no just cause of complaint as to the jury. *Long* v. *State,* 109 Ohio St., 77, 141

N. E., 691; *Selvaggio* v. *State,* 19 C. C. (N. S.), 88, 90, 25 C. D., 139.

It is earnestly argued that the conviction is manifestly against the weight of the evidence, and this claim has necessitated an exhaustive examination of the record. The defendant relied on an alibi, and the case turned largely on the identity of Lutes, as one of the bandits present in the pool room known as the Pelican Club in North College Hill at the time of the murder of Peter Dumele. The bill of exceptions discloses that about 25 men were present in that pool room on the night in question, many of whom were standing around one of the pool tables, shooting craps. Shortly after 1 o'clock in the morning a gang of five or six bandits came into the room, and with much noise, shouting, and confusion ordered those present to hold up their hands and face the wall, which they did with more or less alacrity. The bandits were armed with revolvers and sawed-off shotguns and proceeded to inaugurate a reign of terror. One of them took a position between the two pool tables and appears to have directed the searching of those present. One or two of the bandits stood near the exit, and others began searching those present, throwing that which they obtained upon a pool-table. Some of the bandits were masked, or partially so, and one or two wore colored glasses, and it is claimed that Lutes was stationed near the outside door and wore no mask, but did have on colored glasses. One of the men, named Staib, who sought to hide his money, was struck in the mouth with the end of a sawed-off shotgun, knocking out most of his teeth and causing him to fall to the floor in an unconscious condition. Those engaged in the actual

search seem to have handed over their weapons to the other bandits during the search. In view of the different positions those who were in the pool room took along the walls, and to the different locations of the bandits, it is not surprising that no one present could get a view of all the bandits and that some were able to identify Ford only, others to identify Messner only, and still others to identify Lutes as the man standing by the entrance door. The identification of Lutes depends largely on the testimony of three witnesses called by the state, Leo Wagner, Druman Wetterer, and James Swing. The robbery occupied fifteen to twenty minutes. Wagner testifies that, instead of retaining his position, which he first took near the southeasterly corner of the room, he worked along toward the piano for the purpose of hiding his money, and that he had a plain view of the bandit standing by the door, that he wore colored glasses and had in his hands two sawed-off shotguns part of the time. Wagner saw Staib struck in the mouth, heard Warnken, who was the proprietor, say that the marshal was coming, and then pleaded with the robbers not to shoot him, and heard one of the robbers say that they should let the marshal come in. Peter Dumele, the village marshal, evidently seeing through the large window that a robbery was in progress, then entered, and was immediately ordered to hold up his hands. Instead of this, on being ordered a second time to hold up his hands, he began to unbutton his overcoat, whereupon the bandits gathered around him and one of them said, ''Let him have it,'' and they all fired and Dumele fell by the door mortally wounded, and fell so near to Wagner that he could almost touch him as he lay on the

floor. Wagner is positive in his identification of Lutes, and testifies that later on he saw him at a dog show and recognized him as the man he had seen standing near the door during the robbery.

Druman Wetterer identified Lutes as the man who stood near the door, wearing dark glasses, and opened the door for the marshal to enter. About June 1st Lutes was arrested as a suspicious character and taken to the police court. Wetterer was present and identified him there as the bandit he had seen standing near the door, but this identification is deprived of much of its weight by the fact that Lutes entered the police court by himself and was pointed out to Wetterer.

James Swing, the third witness, who identifies Lutes, is a deputy in the police court, and testifies that the defendant stood near the door and wore glasses. The testimony shows that Swing did not know, when Lutes was brought into the police court, that he had been arrested, and Swing testified that Lutes was sitting on a bench with 15 other men, and he picked him out as the man who stood near the door in the Pelican Club. Swing testifies that at the time he saw Lutes in the police court he had not seen any picture of him.

It is asserted in the brief of counsel for Lutes that the eyewitnesses called by the defense "had equal opportunity with the witnesses for the state to observe the men in the room and testified that Lutes was not one of the robber gang." This statement has challenged the attention of the court to the testimony of the witnesses on identity called by the defendant, and we are fully convinced by a careful reading of that testimony that far too much is

claimed for it. They did not have the same opportunity to observe the defendant that the three eyewitnesses called by the state had, nor did they testify that the defendant was not the bandit standing by the door. This general situation is shown by the following statements, one or more of which are taken from the testimony of each of the sixteen witnesses on identity called by the defense:

One of them testified that he could not say if Lutes was the man or not; another, that he was not able to see the robber who was by the door; another, that he did not see the marshal come in, nor see him at any time, nor did he see the bandits go around him; another, that he only saw two bandits, although he knows more were there; another, that he was asleep when the bandits entered, and only saw the one that searched him; another one testifies that he did not see any bandit with smoked glasses and did not see the marshal come in, that he heard the shots and dropped behind the pool table and does not know whether Lutes was there or not; another one testified that he did not see the bandit by the door and did not see the marshal until it was all over. Still another witness testifies that he did not see any one well enough to recognize him. Another witness, called by the defense, testified that he ducked behind the screen and did not see any one well enough to recognize him. Another one states that he only had a fleeting glance and did not look around until all the bandits were gone. Another witness says that he did not look around, but "peeped" once, and then the backs of the bandits were turned towards him. Another witness says he only saw the first bandit who came in and would

not know any of them if he saw them; and another, that he only saw the bandit who searched him and he could not identify that one. Another witness testifies that he could not see any of the bandits and did not see the marshal. Still another witness testified that, if they were all in front of him, he would not be able to recognize any of them. The other two so-called eyewitnesses called by the defense testify that they could not identify any of the bandits, and did not recognize Lutes. These brief statements, coming from the witnesses called by the defense, show in a general way the weakness of their testimony on identification, and rise, at most, no higher than negative evidence.

The evidence shows that Lutes was an electrician residing at Middletown, and that he left his employment a year or two before the date of the crime, and thereafter was engaged as a rumrunner and operator of an illicit whisky still, and as a gambler, without other employment.

As already stated, the defendant relies on an alibi, and very substantial evidence is offered to the effect that on the night before Easter, 1928, he was at home with his wife and some company, consisting of his mother and his wife's sister and her husband, and that they were playing cards until about midnight. This testimony is corroborated by some neighbors who saw lights in the Lutes home late that night, and some of them saw that the parties in that home were playing cards. The testimony of relatives who say they were in the house playing cards is that they quit playing about midnight, and then got into their automobile and went home. Lutes and his wife testify that after the company had

departed they retired for the night. Lutes was not arrested and charged with the murder of Dumele until October, 1928, about six months after the crime was committed, and of course none of the witnesses on alibi had their attention called to his whereabouts on the night of the crime until after his arrest. Those witnesses, however, are quite certain as to the date, fixing it by the fact that it was the night before Easter. Lutes' brother-in-law, with the aid of his automobile and speedometer, measured the distance from North College Hill to his own home and from there to Lutes' home and states that it is 34 miles, and that it took him one hour and fifteen minutes to drive the distance, going at a rate of speed from 30 to 50 miles per hour. It does not, however, appear that he took the most direct route, nor the best route. He does state that he traveled on route 9 and route 4, and that the road for some distance was not good, but he fails to state for what distance or to what extent the road was poor. Neither does the witness state when he drove over the route, but it was six months or more after the crime, and the condition of the road at that time would not be very valuable evidence of its condition 6 or 10 months earlier.

In determining the credit to be given to the witnesses called by the defendant on alibi, the jury would have to consider the accuracy of their testimony as to the date of the card party, and also the question whether the defendant could have driven from his residence to North College Hill, after the company left, in time to be one of the bandits committing the crime. The jury may have found that it was entirely possible for him to drive from his

home to that point within an hour. Lutes had a Hudson sedan in his garage and was clearly an experienced driver, and evidence of an alibi would not be very valuable if it was still possible for the defendant to be present at the commission of the crime. *Sabo* v. *State,* 119 Ohio St., 232, 163 N. E., 28.

Witnesses called by the state testify that on the night before Easter, 1928, Lutes was in the Koelker camp, a few miles from Middletown, until 9:00 or 9:30 in the evening, with one Jack Parker, and that he left at that time in an automobile with others and was gone until 3:00 or 4:00 o'clock of the following morning. According to this testimony Lutes was in hiding at this camp for some time after the crime was committed and until just before the camp was raided. The testimony shows that later on he was in what is called the Oregonia camp, which was also a place where whisky was being illicitly manufactured. It is true that this testimony comes from Koelker, who was engaged in the illicit distilling business himself, and from his wife, and from a witness named Harry Morgan. When first arrested Lutes gave the officers an assumed name and gave a false statement as to where he was employed.

This resume of the testimony will show in a general way the question of fact which the jury was called on to decide. After giving the entire evidence the most careful consideration that we are able to give, we cannot say that the verdict is manifestly against the weight of the evidence. It must be remembered that we are not triers of the facts. On the entire record the jury may have found, and justly so, that Lutes was present on the night of the murder, participating therein as one of the bandits.

Many claimed errors are urged in the admission and rejection of testimony. The defendant took the stand and testified, and also offered testimony tending to show that he bore a good character as being a peaceable and quiet citizen. Having put his character in that respect in issue, it was of course competent for the state to meet that claim by specific instances of violation of law on his part tending to show that his character was not of the kind claimed. *Sabo* v. *State,* 119 Ohio St., 231, 163 N. E., 28. We find no error to the prejudice of the defendant in the admission or rejection of evidence.

In charging the jury the trial judge instructed the jury as to first-degree murder only, omitting all reference to any included offense, and this omission to charge on second degree murder is assigned as error. The verdict is general and found the defendant guilty on all of the counts contained in the indictment. The evidence shows, without contradiction, that the murder was committed in the perpetration of a robbery, and that Peter Dumele was a police officer engaged in the performance of his duty, and known to be such by the bandits, that fact having been announced by the proprietor of the pool room before the marshal entered. On failing to comply with the direction to hold up his hands, an order was given to "let him have it," and thereupon all the bandits shot. In the opinion of this court the trial judge was correct in charging only on first-degree murder. The only defense was that the defendant was not present and was not participating in the crime. If Lutes was present, participating in the crime as one of the bandits, he was guilty of murder in the first degree, and, if not

present as one of the conspirators, he should have been acquitted. *Bandy* v. *State,* 102 Ohio St., 384, 131 N. E., 499, 21 A. L. R., 594.

The plaintiff in error contends that the trial court erred in refusing his counsel the opportunity to read from books numerous instances of claimed mistaken identity and to adopt the same as a part of his argument. We think this matter was entirely within the reasonable discretion of the trial court. The matter offered to be read covers many pages, and consists of instances where it is claimed there had been a mistake made as to the identity of the accused. Certainly counsel had the right to read from a book on science or art shown to be authoritative on the subject, but the latitude to be given is within the sound discretion of the trial court. This trial, counting the time used in impaneling the jury, had already taken substantially a month. The record does not contain the argument made to the jury by counsel for the defendant, nor does it appear how much time he had taken in the argument. He may already have discussed in detail many instances of mistaken identity, and to permit counsel to supplement that by reading to the jury purported facts in such cases, the accuracy of which facts had not been shown, would be more confusing than helpful. We find no prejudicial error in the action of the court in declining to permit counsel to read what he sought to read to the jury.

This court has given careful consideration to all of the errors claimed to exist in the record, but we find none to the prejudice of the plaintiff in error. The judgment will be affirmed.

*Judgment affirmed.*

WILLIAMS and LLOYD, JJ., concur.

Judges WILLIAMS, LLOYD and RICHARDS of the Sixth Appellate District sitting in place of Judges CUSHING, ROSS and HAMILTON, of the First Appellate District.